UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PAULA COUNTS O/B/O
KANESWA FANNIE,

        Plaintiff,

vs.                                   Case No.  3:04-cv-334-J-MCR

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

    This cause is before the Court on Plaintiff's appeal of an administrative decision denying her minor daughter's application for Social Security benefits.  The Court has reviewed the record, the briefs and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

    Plaintiff, Paula Counts, protectively filed an application for childhood Supplemental Security Income ("SSI") disability benefits on November 9, 2000, on behalf of her daughter, Kaneswa Fannie, alleging an onset date of September 29, 1991. (Tr. 99, 100).  The Social Security Administration ("SSA") denied this application initially and on reconsideration. (Tr. 36-39).  Plaintiff then requested and received a hearing before an Administrative Law Judge (the "ALJ") on May 7, 2003.  (Tr. 30-57).  On

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 9).

November 3, 2003, the ALJ issued a decision finding the Claimant was not disabled.
(Tr. 15-26).  On December 20, 2003, Plaintiff filed a Request for Review by the Appeals
Council.  (Tr. 7-8).  The Appeals Council denied Plaintiff's request for review, thus
making the ALJ's November 3, 2003 decision the final decision of the Commissioner.
(Tr. 4-6).  Plaintiff timely filed her Complaint in the U.S. District Court on May 4, 2004.
(Doc. 1).

On June 28, 2005, counsel for Plaintiff notified the Court that Plaintiff filed a
subsequent application for SSI benefits on behalf of her daughter and that the
Commissioner found Ms. Fannie disabled on February 10, 2005 and entitled to benefits
beginning in December 2003.  (Doc. 16).  Accordingly, the undersigned is only
concerned with the time period September 29, 1991 to December 2003.

## II.    NATURE OF DISABILITY CLAIM

### A.    Basis of Claimed Disability

Plaintiff claims her daughter is disabled since September 29, 1991, her date of
birth, due to sickle cell trait, learning disabilities, diabetes and low blood count.  (Tr.
113).

### B.    Summary of Evidence Before the ALJ[2]

Claimant was twelve years of age on the date the ALJ's decision was issued.
(Tr. 99).  At the time of the hearing, she was enrolled in the fourth grade in regular and
ESE classes.  (Tr. 36-37).  Claimant's medical history is summarized in the ALJ's

---

[2]  Because Plaintiff's appeal is limited to issues involving Claimant's mental impairments,
the Court will limit its summary to evidence regarding Claimant's mental state.

decision.  By way of summary, Claimant was seen by Dr. Harry Abram in September 1999 because of her hyperactivity.  Dr. Abram noted that from a neurological perspective, Claimant had an intact examination with no focal deficits and that the "vast majority of [Claimant's] problems appear to be behavioral in nature."  (Tr. 401).  Dr. Abram prescribed Ritalin and recommended Claimant seek psycho-behavioral counseling through the Child Guidance Center and psychoeducational testing through the school system.  (Tr. 401).

Claimant began counseling with the Child Guidance Center in October 1999 and continued until March 2001 when the Center stated it could no longer assist Claimant because of budget cuts.  (Tr. 41, 373-84).

Claimant underwent a school psychological evaluation from January 25, 2000 to February 15, 2000.  Claimant was referred for the testing due to difficulty in all academic areas but especially in language arts.  (Tr. 355).  It was noted that Claimant did not retain information and that she had great leadership qualities but was sometimes bossy. (Tr. 355).  The evaluator noted that Claimant presented as an amiable and friendly student and that rapport was easily established.  (Tr. 357).  Her attention and concentration appeared adequate for the testing, she completed all tasks presented and the evaluator noted that the test results were considered an accurate reflection of Claimant's abilities.  (Tr. 357).  On the Wechsler Intelligence Scale for Children, Claimant achieved a verbal scale IQ score of 87, a performance scale IQ score of 79 and a full scale IQ score of 81.  (Tr. 357).  Further testing revealed one  process deficit

(long-term retrieval) and two achievement deficits (broad reading and basic writing skills).  (Tr. 360).

On January 12, 2001, Claimant was evaluated by Lauren Lucas, Ph.D. at the request of the Social Security Administration.  Dr. Lucas noted that Claimant rode the bus to school, emptied the trash and occasionally helped clean her room, watched television, stated she had friends and enjoyed riding her bike and rollerblading.  (Tr. 363-64).  Dr. Lucas administered the Wechsler Intelligence Scale for Children with the following results: verbal IQ score of 81, performance IQ score of 64 and full scale IQ score of 70.  (Tr. 363).  Dr. Lucas believed the scores were reliable and reflected an overall intellective functioning within the low-average range of intelligence; mild range of mental retardation; and borderline range of intelligence, respectively.  (Tr. 363).  Dr. Lucas noted the substantial difference between Claimant's verbal IQ and performance IQ scores and believed they suggested a Visual Perceptual Learning Disorder.  (Tr. 363).

On September 10, 2003, Claimant underwent a consultative examination at the request of the Social Security Administration by Peter Knox, M.Ed., Psy.D., DABPS. (Tr. 485).  During the examination, Dr. Knox noted that Claimant was uncooperative; refusing to talk, shrugging her shoulders in response to every question and maintaining very little eye contact.  (Tr. 487).  Dr. Knox noted that Claimant appeared to be functioning in the low range of intelligence for her age group, however, Dr. Knox was not able to administer the Wechsler Intelligence Scale for Children because of Claimant's refusal to participate.  (Tr. 487-88).

-4-

Claimant's school records indicate that she was put in Exceptional Student Education ("ESE") classes for math and language arts in May 2000.  (Tr. 167).  At that time, Claimant was in first grade and was functioning at a preschool level in language arts and at a low first grade level in math.  (Tr. 166).  Claimant continued in ESE classes for math and language arts in second grade and in May 2001, it was noted that Claimant was functioning at a first grade level in language arts and a high first grade level in math.  (Tr. 157).  On May 17, 2001, Claimant's ESE teacher, Cynthia Cuttino, completed a questionnaire.  Claimant was in second grade and was in ESE/SLD classes three hours a day.  (Tr. 149).  According to Ms. Cuttino, Claimant was performing at a first grade level independently/second grade with help in reading and comprehension and at a second grade beginning level in math.  (Tr. 150).  Ms. Cuttino noted that Claimant worked hard and that any problems with her work were because of her frustration with the work or with other children.  (Tr. 150).  She also stated that the regular class was more stressful for Claimant.  (Tr. 150).  Ms. Cuttino further stated that Claimant was not significantly behind the other SLD students but that Claimant could not do most of the regular class language arts work.  (Tr. 151).  Claimant's second grade report card showed that she was making C's and S's.  (Tr. 342).  Claimant was showing improvement, was cooperative and helpful, however, needed to talk less in class and was demonstrating disruptive behavior.  (Tr. 342).

In third grade, an Individual Education Plan ("IEP") was completed on April 26, 2002 and indicated that Claimant was functioning at a second grade level, got angry and upset in regular classes, had negative peer interactions and could be disruptive in

regular classes. (Tr. 190). However, it was further noted that Claimant was able to stay on task, had great patience with younger children, had good manners and listening skills, comprehended fairly well and was reliable and trustworthy. (Tr. 190). An end of the year Progress Report revealed that Claimant was making good progress with continual assistance in all areas. (Tr. 220). Claimant's third grade report card indicates Claimant made C's, was working to the best of her ability, took a keen interest in all her work and was a good school citizen. (Tr. 343). However, by the end of the year, it was noted that Claimant's disruptive behavior was affecting individual and class progress. (Tr. 343).

On March 13, 2003, while Claimant was in fourth grade, another IEP was completed for Claimant. It indicated Claimant was functioning at a third grade level but was working on some fourth grade skills with assistance. (Tr. 245). It also stated that Claimant got angry and upset in regular classes, had negative peer interactions and could be disruptive in regular classes. (Tr. 245). Again, the IEP further noted that Claimant was able to stay on task, had great patience with younger children, had good manners and listening skills, comprehended fairly well and was reliable and trustworthy. (Tr. 245). Claimant's fourth grade report card dated March 26, 2003 shows she made A's, B's and C's. It was noted that Claimant was performing to the best of her ability, however, her disruptive behavior was affecting individual and class progress. (Tr. 341). On April 28, 2003, Claimant's ESE teacher, Ms. Cuttino, completed another questionnaire and indicated that Claimant was trying to work on the same skills as her grade level; however, she read below grade level and learning new skills was frustrating

to her.  (Tr. 333).  She was reading at an ending second grade to beginning third grade level and her math was about third grade except she did not know multiplication and made errors counting.  (Tr. 333).  Ms. Cuttino noted Claimant had difficulty with new skills and got very frustrated but opined that helping Claimant one-on-one would catch her up.  (Tr. 334).

Claimant's fifth grade progress report dated August 29, 2003 shows that Claimant was doing outstanding in all subjects except citizenship (which needed improvement) and homework (which was satisfactory).  (Tr. 354).  It also stated that Claimant worked well in class and contributed to discussions.  (Tr. 354).  The comments noted that Claimant did her work everyday; however, her attitude was not good and at times she became disrespectful and nasty to the other students.  (Tr. 354).        **C.**

## **Summary of the ALJ's Decision**

In order for an individual under the age of eighteen to be entitled to Supplemental Security Income payments, a claimant must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(C)(I); 20 C.F.R. §416.906.  Under the applicable regulations, a three-step evaluation process is utilized.  First, a determination as to whether the claimant is engaged in substantial gainful activity must be made.  If not, the next determination is whether the claimant has a severe impairment or combination of impairments.  If so, it must then be determined whether the impairment or combination of impairments meet *or* is medically *or* functionally equal to an impairment listed in

-7-

Appendix 1 of 20 C.F.R. part 404, subpart P, and otherwise satisfy the duration

requirement.  Where each of these requirements is satisfied, the claimant will be found

disabled.  20 C.F.R. §§416.924 - 416.926a (emphasis added); Wilson v. Apfel, 179 F.3d

1276, 1277 n.1 (11th Cir. 1999).

In the instant case, the ALJ determined Claimant was not engaged in substantial

gainful activity.  (Tr. 16, 25).  At step two, the ALJ determined the child had severe

impairments: attention deficit disorder and specific learning disorder.  (Tr. 23, 26).  The

ALJ specifically noted that Claimant's hemoglobin-C trait did not affect her functioning

and was not severe.[3]  At step three, the ALJ determined Claimant's impairments did not

meet, medically equal or functionally equal the criteria of any of the impairments listed in

Appendix 1, Subpart P of the Regulation No. 4.  (Tr. 23, 25-26).  In making that

determination, the ALJ found Claimant's and her mother's testimony not entirely

credible.  (Tr. 26).  Therefore, the ALJ found Plaintiff was not disabled within the

meaning of the Social Security Act.  (Tr. 25-26).

## III.    STANDARDS OF LAW

### A.    The Standard of Review

The scope of this Court's review is limited to determining whether the ALJ

applied the correct legal standards, McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir.

---

[3]  The Court notes that although Claimant's mother repeatedly states her daughter has sickle cell trait or sickle cell disease, Plaintiff was informed by the Sickle Cell Clinic back in May 2002 that her daughter had hemoglobin-C trait, which is not sickle cell trait or sickle cell anemia and that her daughter would "have no major sequelae because of her hemoglobin-C trait and no specific precautions or medications were needed." (Tr. 432).  Additionally, Plaintiff was notified back in May 2001 that her daughter did not have diabetes (Tr. 389) and in January 2002 that her daughter did not have hypoglycemia (Tr. 438).

1988), and whether the findings are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Foote v. Chater, 67 F.3d 1553, 1560 (11ᵗʰ Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11ᵗʰ Cir. 1982) and Richardson, 402 U.S. at 401).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11ᵗʰ Cir. 1991); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11ᵗʰ Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11ᵗʰ Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**IV.   ANALYSIS**

Plaintiff argues one main issue on appeal.  Plaintiff asserts that the ALJ erred in failing to find Claimant's impairments met the requirements of Listing 112.05D for mental retardation.  (Doc. 12).  Specifically, Plaintiff argues that her daughter's IQ

scores as determined by Dr. Lucas, the consultative examiner, met the requirements of Listing 112.05D and the ALJ erred in rejecting those IQ scores.

The Commissioner responds that the decision of the ALJ is indeed based on substantial evidence because in order for Claimant to meet the requirements of Listing 112.05D, Claimant needed to be diagnosed with mental retardation and nowhere in the record is there evidence of Claimant being diagnosed with mental retardation.  (Doc. 13).

The ALJ did not specifically mention Listing 112.05D in the opinion.  However, in determining that Claimant's impairments were not functionally equal to any Listing, the ALJ found the IQ scores of Dr. Lucas "invalid because they [were] based on a one-time examination and [were] inconsistent with school records and other psychological testing."  (Tr. 24).  Plaintiff claims it was error for the ALJ to reject those IQ scores and compares the ALJ's reasoning that an IQ score is invalid because it is based on a one-time evaluation to "stating that a cardiac stress test or blood test or MRI is not reliable because the person administering the test only saw the patient one time."  (Doc. 12, p.8).  If the ALJ had accepted the IQ scores obtained by Dr. Lucas, Plaintiff argues that Claimant would meet the requirements of Listing 112.05D.  The Commissioner disagrees because Plaintiff has not been specifically diagnosed with mental retardation and therefore cannot satisfy the diagnostic description found in the introductory paragraph of listing 112.05.

A claimant has the burden of proving her condition meets or equals an impairment listed in Appendix 1.  20 C.F.R. §§ 416.925(d) and 404.1525(d).  "In order to

meet listing 112.05D, a claimant must show that her impairment satisfies the diagnostic description in the introductory paragraph and any one of the six sets of criteria . . ." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(A).  The diagnostic description for listing 112.05 states that mental retardation is "characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning."  20 C.F.R. Part 404, Subpart P, Appendix 1, §112.05.  An individual possesses the required level of severity for this disorder if she meets one of the six subparts or criteria enumerated under the diagnostic definition.  Id.  Subpart (D) 112.05, the criteria upon which Plaintiff relies, requires a claimant to show two things.  First, that she has a "valid verbal, performance, or full scale IQ of 60 through 70" and second, "a physical or other mental impairment imposing additional and significant limitation of function."  20 C.F.R. Part 404, Subpart P, Appendix 1, §112.05(D).

In the present case, Plaintiff argues the Performance IQ score of 64 obtained by Dr. Lucas satisfies her burden of presenting a valid IQ score between 60 and 70.[4]  The Court finds Plaintiff has failed to meet her burden of showing that Claimant meets the requirements of Listing 112.05D because Plaintiff has not satisfied the first requirement of providing a **valid** IQ score between 60 and 70.[5]  The IQ score upon which Plaintiff

---

[4] Where more than one IQ is derived from a test (i.e. a verbal score, performance score and full score), the lowest is to be used in conjunction with listing 112.05.  20 C.F.R. Part 404, Subpart P, Appendix 1, §112.00(D)(9).

[5] Although the Commissioner argues at length that Plaintiff has failed to present evidence showing Claimant satisfies the diagnostic description because she cannot point to a diagnosis of mental retardation, the Court is not persuaded by this argument.  The record reflects Dr. Knox diagnosed Claimant with suspected mild retardation to borderline IQ.  (Tr. 489).  The undersigned does not believe and the Commissioner has pointed to any authority showing that it is necessary
(continued...)

relies is invalid for several reasons.  First, it is stale.  "IQ test results must also be

sufficiently current for accurate assessment under 112.05. . . .  IQ test results obtained

between ages 7 and 16 should be considered current for 4 years when the tested IQ is

less than 40, and for 2 years when the IQ is 40 or above."  20 C.F.R. Part 404, Subpart

P, Appendix, §112.00(D)(10).  Here, the test results at issue were obtained on January

12, 2001 and the final hearing was conducted on May 7, 2003.  Accordingly, the IQ test

results were over two years old at the time of the hearing and therefore, not valid.[6]

Furthermore, even if the IQ test results from Dr. Lucas were current, the

undersigned finds the ALJ properly rejected the scores.  The Eleventh Circuit has

determined that an ALJ may properly reject an IQ score if it is inconsistent with other

evidence in the record regarding the claimant's daily activities and behavior.  Popp v.

Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986).  In this case, the record evidence

supports the ALJ's decision to reject the IQ scores from Dr. Lucas.  As the ALJ noted,

although Claimant was in special classes, sometimes got off task and was easily

frustrated, she was not failing in school.  Indeed, the report cards included in the record

show that in second and third grades, Claimant received C's; in fourth grade, Claimant

_____

[5](...continued)
for a claimant to have a diagnosis of mental retardation in order to satisfy the diagnostic description
of mental retardation in the listings.

[6]  Plaintiff urges the Court to accept the Lucas IQ scores pursuant to Commissioner's
Program Operations Manual Systems which permit a favorable finding of metal retardation under
listing 112.05 utilizing IQ scores that are not current so long as there is evidence from "an
acceptable medical source which establishes that the child is mentally retarded, i.e., that he/she
has a significantly subaverage level of general intellectual functions with deficits in adaptive
functioning." (Doc. 16, Ex. B).  Because the Court finds the ALJ properly rejected the Lucas IQ
scores on grounds unrelated to their timeliness, it is not necessary to determine whether to allow
the untimely scores to be utilized.

received A's, B's and C's (with a D in conduct) and in fifth grade, a progress report showed that Claimant was doing outstanding work.  (Tr. 354).  Additionally, the consultative examiner who reviewed Claimant's medical records noted the two IQ scores and opined that the score obtained by the school examiner "was a better estimate due to [the] positive attitude" displayed by Claimant, "which was not observed" during the testing by Dr. Lucas.  (Tr. 371).

Further, the ALJ properly referenced evidence in the record which is inconsistent with an IQ score of 64.  For example, the ALJ noted Claimant's SLD teacher, Ms. Cuttino's statements in 2001 (second grade) that Claimant was performing at a first grade level independently/second grade with help in reading and comprehension and at a second grade beginning level in math and was not significantly behind the other SLD students.  (Tr. 150-51).  The teacher noted, however, that all of the SLD students were behind the regular class students and that Claimant could not do most of the regular class Language Arts work and needed much more practice and drill in math than the other students.  (Tr. 151).  In 2002, Claimant's teacher noted that Claimant was making "slow but steady progress."  (Tr. 214).  At the end of the year report, it was noted that Claimant was making good progress with continual assistance in all areas and that she was in the "highest group" and could read and answer comprehension questions appropriately most of the time.  (Tr. 220).  In April 2003, Claimant's teacher noted that she completed all of her work and helped younger students with their work.  (Tr. 334).  The teacher further stated that Claimant sometimes had difficulty with new skills and would get very frustrated but that "one-on-one will catch her up."  (Tr. 334).  Finally, the

-13-

records reveal Claimant had no problems with speech or language; gross or fine motor skills; or self help skills.  (Tr. 150-52, 333-36, 362-64, 488).

As such, the undersigned finds ALJ's decision to reject the IQ scores by Dr. Lucas is supported by substantial evidence.  Accordingly, Plaintiff has not met her burden of showing Claimant met all of the requirements of Listing 112.05(D).

## V.   CONCLUSION

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g).  The Clerk is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida this   22nd   day of August, 2005.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record

-14-